# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | P. Michael Mahoney |
|---|---|---|---|
| **CASE NUMBER** | 04 C 50126 | **DATE** | 12/15/2004 |
| **CASE TITLE** | | Vice vs. Barnhart | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]     In accordance with the attached, it is the Magistrate Judge's Report and Recommendation that the ALJ's decision to deny benefits to Plaintiff be sustained, affirming the ALJ at all steps of the disability determination process. It is the Magistrate Judge's further Recommendation that Defendant's Motion for Summary Judgment be granted, and Plaintiff's Motion for Summary Judgment on the administrative record and pleadings be denied. Parties are given ten days from service, as calculated under Rule 6, to file objections with Judge Reinhard, pursuant to Fed. R. Civ. P. 72. Objections need not be presented as stated in L.R. 5.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | number of notices | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | | | |
| ✓ | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | date docketed | | |
| | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | docketing deputy initials | | |
| ✓ | Copy to judge/magistrate judge. | | 12/15/2004 | | |
| AM | courtroom deputy's initials | | date mailed notice   GG | | |
| | | | mailing deputy initials | | |
| | | | Date/time received in central Clerk's Office | | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | | |
|---|---|---|
| MARK VICE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 04 C 50126 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | P. Michael Mahoney |
| JOANNE B. BARNHART, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Mark Vice ("Plaintiff") seeks judicial review of the final decision of the Commissioner

of the Social Security Administration ("Commissioner"). *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

The Commissioner's final decision denied Plaintiff's application for Disability Insurance

Benefits ("DIB") pursuant to Title II of the Social Security Act (the "Act"). 42 U.S.C. §§ 416,

423. This matter is before the Magistrate Judge for Report and Recommendation pursuant to

Rule 72(b) of the Federal Rules of Civil Procedure and 28 U.S.C. § 636(b)(1)(B).

## I.    BACKGROUND

Plaintiff filed for DIB on July 5, 2001 (Tr. 53), and his application for benefits was

denied on October 29, 2001. (Tr. 20). Plaintiff filed a request for reconsideration on December

17, 2001, and his application was denied after reconsideration on January 28, 2002. (Tr. 24, 26).

Plaintiff then filed a request for a hearing before an Administrative Law Judge ("ALJ") on

March 18, 2002. (Tr. 32). Plaintiff appeared, with counsel, before an ALJ on July 9, 2003. (Tr.

194). In a decision dated July 25, 2003, the ALJ found that Plaintiff was not entitled to DIB.

(Tr. 12-17). Plaintiff's request for a review of the ALJ's decision by the Appeals Council was received on August 21, 2003. (Tr. 9). On January 16, 2004, the Appeals Council denied Plaintiff's request for review. (Tr. 5-7).

## II.   FACTS

Plaintiff was born on October 26, 1961, making him forty-two years of age at the time of his July 9, 2003, hearing before the ALJ. (Tr. 119, 194). Plaintiff completed his education through the twelfth grade. (Tr. 77). At the time of his hearing, Plaintiff lived with his wife. (Tr. 207). Plaintiff was approximately six foot two inches tall and weighs approximately 248 pounds. (Tr. 70). Plaintiff's primary impairments noted by the ALJ were bilateral carpal tunnel syndrome, left knee arthritis, and right knee chondromalacia[1]. (Tr. 28).

Plaintiff had no reported income since April 4, 2000. (Tr. 13). Plaintiff worked for Com-Ed, Exelon from February 23, 1981, to April 4, 2000, performing mechanical maintenance in various capacities. (Tr. 72, 82). Plaintiff worked as a "B-Mechanic" from 1984 to 1987 at a rate of pay of $36,583.59 per year. (Tr. 83). Plaintiff performed multiple maintenance tasks on nuclear equipment. (*Id.*). At this job, Plaintiff walked between one and four hours each day, stood five to eight hours, sat for one to two hours, climbed one hour, stooped, kneeled, crouched, and crawled five to eight hours, and handled big objects for eight hours a day. (*Id.*). Plaintiff lifted up to 100 pounds, and frequently lifted fifty pounds at his job. (*Id.*).

Plaintiff worked as an "A-Mechanic" from 1987 to 1994 at a rate of pay of $50,754.83 per year. (Tr. 84). Plaintiff repaired nuclear equipment and supervised other mechanics. (*Id.*). At this job, Plaintiff walked between one and four hours each day, stood five to eight hours, sat

---

[1]Arthritis is inflammation of a joint; Chondromalacia is softening of cartilage. STEDMAN'S MEDICAL DICTIONARY 149, 341 (26th ed. 1995).

for one to two hours, climbed one hour, stooped, kneeled, crouched, and crawled five to eight hours, wrote or handled small objects for one hour, and handled big objects for eight hours a day. (*Id.*). Plaintiff lifted up to 100 pounds, and frequently lifted fifty pounds at his job. (*Id.*).

Plaintiff worked as a Tool Crib Attendant from 1994 to 1997 at a rate of pay of $59,000.00 per year. (Tr. 85). Plaintiff tracked tool inventory and completed tool organization, maintenance, and repair. (*Id.*). At this job, Plaintiff walked between one and four hours each day, stood four to six hours, sat for two hours, climbed one to two hours, kneeled and crouched one to two hours, wrote or handled small objects for one to two hours, and handled big objects for eight hours a day. (*Id.*). Plaintiff lifted up to 100 pounds, and frequently lifted fifty pounds at his job. (*Id.*).

Plaintiff worked as an "A-Mechanic" from 1997 to 1999 at a rate of pay of $65,000.00 per year. (Tr. 86). Plaintiff repaired nuclear equipment and supervised other mechanics. (*Id.*). At this job, Plaintiff walked between one and four hours each day, stood five to eight hours, sat for two hours, climbed one hour, kneeled, stooped, crawled and crouched five to eight hours, wrote or handled small objects for one hour, and handled big objects for eight hours a day. (*Id.*). Plaintiff lifted up to 100 pounds, and frequently lifted fifty pounds at his job. (*Id.*).

Plaintiff worked as a Tool Crib from 1999 to 2000 at a rate of pay of $60,000.00 per year. (Tr. 87). Plaintiff tracked tool inventory and completed tool organization, maintenance, and repair. (*Id.*). Plaintiff worked eight hours a day, five days a week. (*Id.*). At this job, Plaintiff walked between one and four hours each day, stood four to six hours, sat for two hours, climbed one to two hours, kneeled and crouched one to two hours, wrote or handled small objects for one to two hours, and handled big objects for six hours a day. (*Id.*). Plaintiff lifted up to 100 pounds, and frequently lifted twenty-five pounds at his job. (*Id.*). Plaintiff stated that

3

he stopped working on April 4, 2000, due to Com-Ed/Exelon's inability to provide work for him because of his medical condition. (Tr. 71).

Plaintiff stated at his hearing that he could not do much during his typical day since he stopped working. (Tr. 207). He watches television, completes small tasks like loading the dishwasher, folding clothes, vacuuming, and mowing the lawn with a riding lawnmower in fifteen minute intervals. (Tr. 207, 217). Plaintiff noted he keeps his left leg on top of the lawnmower as he mows. (Tr. 217). Plaintiff also visits with his granddaughter occasionally. (Tr. 207). Though Plaintiff can drive short distances, he noted that his leg locks up after forty minutes. (Tr. 202). Plaintiff stated that he gave up his hobbies of baseball, football, bodybuilding, and lifting because of his condition. (Tr. 221). Plaintiff elevates his leg and takes a lot of naps to relieve his pain. (Tr. 207, 221). Finally, Plaintiff stated he sometimes sleeps solid at night, but other nights are restless. (Tr. 222).

Plaintiff testified at his hearing about medical problems with his left leg. (Tr. 199). Plaintiff stated that his left knee is in a custom brace made to keep his knee from locking up or buckling. (Tr. 199). He stated that his left leg does not have much strength, and that he currently wears a brace during all of his waking hours. (Tr. 199-200). Plaintiff's knuckles were scratched at the hearing from a recent fall down a flight of stairs when his knee buckled. (Tr. 200). Plaintiff stated his legs buckle at varying rates, between once every other day and twice in one day, and that he does not know when his knee will buckle until it happens. (Tr. 201).

If Plaintiff is unable to move his leg after about forty minutes (such as when he drives), his left leg swells up and becomes hard to bend. (Tr. 202). Plaintiff needs to stretch, elevate and/or ice his leg to decrease swelling. (Tr. 203). He stated that he usually ices his left leg every other day. (*Id.*). Plaintiff further stated that his leg swells at night while he sleeps, so that it

4

takes up to twenty minutes for his leg to relax after he wakes up. (Tr. 203-04). Plaintiff stated

the pain in his left knee is constant, and a seven on scale of one to ten, ten being pain

necessitating a trip to the emergency room. (Tr. 215, 223). Plaintiff indicated that his surgeries

have affected the circulation in his legs, and that humid weather aggravates his pain. (Tr. 204).

Plaintiff takes DarvocetN©100[2] for his left leg pain every three hours. (Tr. 204). The Darvocet

brings Plaintiff's pain down to a five (on a scale of one to ten) for two to three hours. (Tr. 223).

Plaintiff supplements the Darvocet with Aleve and Aspirin in the afternoon and at night. (Tr.

224).

Plaintiff also testified about his medical problems with his right leg at his hearing. (Tr.

205). Plaintiff has a neoprene brace on his right leg that is worn on cold and damp days to

alleviate Plaintiff's arthritis pain. (*Id.*). Plaintiff reported that the brace also helps to keep his

patella (knee cap) from popping out, which it frequently does. (*Id.*). Additionally, Plaintiff has

swelling problems with his right knee, but not as bad as with his left knee. (*Id.*). Plaintiff

reported icing his right knee once a week, and stated it pops out about once a month. (Tr. 205-

06). Plaintiff reported that he does not sit with his legs bent. Instead, he elevates or sticks his

legs out straight to keep pressure off his knees. (Tr. 207). He stated he had been elevating his

legs for the last three years (Tr. 220), and that he had discussed total knee replacements with his

doctor. (Tr. 212).

Plaintiff reported taking Hyalgan injections[3] approximately every six months for his

---

[2] Contains 100 mg propoxyphene and 650 mg acetaminophen. Indicated for relief of mild to moderate pain, taken every four hours as needed, maximum recommended dose 600 mg propoxyphene a day. PHYSICIAN'S DESK REFERENCE 402 (59th Ed. 2005).

[3] Indicated for the treatment of pain in osteoarthritis of the knee in patients who have failed to respond adequately to conservative nonpharmacologic therapy and simple analgesics. PHYSICIAN'S DESK REFERENCE 3005 (59th Ed. 2005).

knees. (Tr. 212). Plaintiff stated the injections take the edge off his pain, but do not make his

knees better. (*Id.*). He described his knee movement after a shot as more free because the pain

is numbed, but stated he could not actually do things better because of the injections. (Tr. 214).

He also noted that the level of relief provided by the injections was decreasing over time. (*Id.*).

Plaintiff also reported difficulties with carpal tunnel in his hands. (Tr. 209). His

symptoms include pain up to his shoulders, numbness, and dropping things (Tr. 209-10).

Plaintiff described using braces while he sleeps to help with the pain. (Tr. 210). Plaintiff

indicated that his hands were to be operated on in the future, and noted that his right hand was

worse than his left hand. (Tr. 214). Plaintiff is right handed. (*Id.*).

Vocational Expert, Frank Mendrick, was present at Plaintiff's hearing, but the ALJ

declined to ask any questions of the expert, stating: "I either accept what he's (Plaintiff) telling

me, or somehow I find he can do sedentary work." (Tr. 224).

## III.   **MEDICAL HISTORY**

Plaintiff's earliest medical records before the court are operative reports from a work-

related injury to Plaintiff's right knee, dated November 12, 1987. (Tr. 112-14). Plaintiff

reported to Dr. James Berg that he was at work when a platform came loose and he fell ten feet[4]

hitting a metal bar with his right leg. (Tr. 113). On examination, Plaintiff's knee was found to

have a grade II and possibly grade III opening of the medial collateral ligament that caused

Plaintiff's knee to give way when he walked. (Tr. 113-14). X-rays ruled out a torn medial

meniscus. (Tr. 114). Plaintiff underwent arthroscopic surgery for a closer examination. (Tr.

112). Plaintiff's postoperative diagnosis was a grade II tear of his medial collateral ligament,

---

[4]The fall was recorded as fifteen feet by Dr. Chhabria on February 22, 1989. (Tr. 121).

traumatic synovitis of the knee with some chondromalacia of the articular cartilage of the lateral articular tibial plateau. (*Id.*).

Plaintiff was admitted to the Northern Illinois Medical Center on May 24, 1988, for a right knee arthrogram. (Tr. 115). Tests revealed no evidence of abnormality of the menisci, but a small to moderate sized popliteal cyst was present behind Plaintiff's knee joint. (Tr. 115-16). (Tr. 196). On November 16, 1988, Plaintiff saw Dr. Berg again regarding flare-ups of his knee with some swelling. Dr. Berg questioned whether Plaintiff's cyst was getting larger and recommended a MRI. (Tr. 118). At a follow-up visit on January 27, 1989, Dr. Berg reported that Plaintiff's MRI showed varicosities, but no cyst. (*Id.*). Plaintiff reported cramping in his calf and weakness in his leg. (*Id.*).

Plaintiff underwent a thermogram on February 8, 1989. (Tr. 119). Dr. William Hobbins recorded his impression of Plaintiff's condition after the procedure, noting "evidence of sympathetic hyper-dysfunction in the right posterior lower extremity. Possible correlation with an S1 peripheral or radiuclar pathology is possible." (Tr. 120). Dr. Hobbins also noted a hyperthermia associated with muscoskeletal referral anteriorly. (Tr. 122). Plaintiff's follow-up with Dr. Berg after his thermogram was on February 20, 1989. (Tr. 117). Dr. Berg noted that Plaintiff had an S1 radiculopathy and reflex sympathetic dystrophy. (*Id.*). To determine the need for a lumbar block, Dr. Berg released Plaintiff to therapy to try to desensitize his leg. Dr. Berg also allowed Plaintiff to return to light duty to recondition his leg. (*Id.*).

Plaintiff was evaluated by Dr. Peter Chhabria of Lake County Neurological Associates on February 22, 1989, for a second opinion on the need for a epidural nerve block. (Tr. 121). Dr. Chhabria noted that Plaintiff was off work for six months after his injury in November, 1987, while he received physical therapy. (*Id.*). Apparently, Plaintiff began having problems with

numbing, swelling, and weakness in his right leg again two to three months after returning to work. (*Id.*). Plaintiff stated his left leg was normal. (*Id.*). The remainder of Plaintiff's notes from the visit with Dr. Chhabria are missing from the record. (*Id.*).

Plaintiff was seen at the Medical Offices of Irwin T. Barnett and Daniel Ludwig on October 5, 1990. (Tr. 123). Plaintiff's subjective complaints were that his right knee joint was painful, that he could not squat or kneel, and that his lower back and right elbow had some pain. (*Id.*). The examining physician noted arthroscopic scars from a surgery on Plaintiff's right knee performed for a lateral release, to remove cartilage and a Baker's cyst, and part of Plaintiff's knee cap. (*Id.*). Swelling and atrophy of Plaintiff's right knee, calf, and thigh were noted. (*Id.*). Plaintiff's patella was freely moveable, but pain and grating was noted, indicating chondromalacia of the patella. (Tr. 124-25). Drawer and Lachman tests were negative; McMurry Sign was positive. (*Id.*). Abduction and adduction tests for collateral ligament injury were slightly positive, as was Apley's Test, indicating cartilage involvement. (*Id.*). The Popliteal area was clear. (*Id.*). X-rays revealed that Plaintiff's patella was intact, but the infrapatellar fat pad was clouded, compatible with ligament or cartilage pathology. (*Id.*). There was no indication of a fracture, joint space disturbance, or significant arthritis. (*Id.*). Heel to toe walking was performed normally. (*Id.*). Plaintiff's back motion was restricted, indicating bilateral sciatic nerve root irritation. (Tr. 126). Discomfort on the flexion of the right elbow was noted. (*Id.*). Dr. Barnett opined that Plaintiff had a "moderate loss of use of the right lower extremity and a residual loss of use of the man as a whole on an industrial basis." (*Id.*).

On May 31, 1994, Dr. Berg wrote a medical consultive report for Plaintiff's attorney regarding a work incident in 1993 when a crate fell on Plaintiff's left leg and knee. (Tr. 127). Dr. Berg reported that the box that hit Plaintiff left a hole four inches deep in Plaintiff's tensor

fascia. (*Id.*). Though Dr. Berg reported no injury to the ligament itself, he noted that the

kneecap would catch and jump considerably. (*Id.*). At the time, Plaintiff was treated with a

Camp brace and medication. (*Id.*). Later, an arthroscopy was performed on the left knee,

including shaving of the chondromalacia of lateral tibia articular cartilage and medial femoral

articular cartilage, patellar shaving, debridement of synovitis and a subcutaneous lateral reticular

release. (*Id.*). Plaintiff did well postoperatively, but was sent to therapy when his kneecap was

not tracking well on the left knee. (*Id.*).

Dr. Berg also stated in his letter that patellar taping was used on Plaintiff in August,

1993, to try to re-balance Plaintiff's knee, but Plaintiff reported that the procedure did not work.

(Tr. 128). Plaintiff was then given a Palumbo brace and he was instructed not to take anti-

inflammatories. (*Id.*). Dr. Berg reported that Plaintiff underwent an arthroscopy on January 21,

1994, because of degeneration of the posterior horn of his medial meniscus. (*Id.*). Plaintiff's

kneecaps were still catching when Plaintiff was seen on March 30, 1994, so he was give a Cho-

Pat to wear on his right knee, and later massaging with Zostrix was instituted. (*Id.*). Dr. Berg

reported that Plaintiff was allowed to return to work on June 13, 1994, with work restrictions of

minimal stairs, no kneeling, no ladders, and no lifting of heavy objects from the bent knee

position. (*Id.*)

As of the date Dr. Berg wrote his letter, he believed that Plaintiff's recovery was

proceeding, but also rated a permanent disability with Plaintiff's patellar femoral problems at

25% and 10% with Plaintiff's medial meniscus. (Tr. 129). He opined that there was

approximately 40% combined disability of Plaintiff's knee. (*Id.*). He noted that future surgical

intervention may be necessary. (*Id.*).

Dr. Berg provided a letter to another one of Plaintiff's attorneys regarding Plaintiff's medical history from December 14, 1998, to June 26, 2000. (Tr. 153-56). According to the letter, Plaintiff saw Dr. Berg in December, 1998, because his knee would lock up when he squatted at work. (Tr. 153). An MRI showed thinning of the patellar articular cartilage and increased signal in the posterior horn of the medial meniscus compatible with degeneration. Surgery was recommended and Plaintiff was told to limit lifting over fifty pounds. (*Id.*). A surgery was performed on January 28, 1999, consisting of arthroscopy of the left knee. (*Id.*). Plaintiff had acute traumatic chondromalacia of the medial face of his patella with large portions of the articular cartilage actually being broken or fractured. (*Id.*).

On April 26, 1999, Plaintiff saw Dr. Berg for a follow-up.[5] (Tr. 152). At the visit, Plaintiff's permanent work restrictions were recorded as no ladders, no kneeling on left knee, no lifting from floor to waist over thirty-five pounds, and no jumping. (*Id.*). On June 16, 1999, Plaintiff reported significant problems with kneecap crepitus, so Dr. Berg pulled the kneecap over medially which eliminated irritation. (Tr. 151). Plaintiff was seen on July 21, 1999, by Dr. Berg, who discussed surgery and treatment options with Plaintiff. (Tr. 149). Dr. Berg expressed his desire to avoid surgery due to the lengthy rehabilitation period, but suggested a second opinion. (*Id.*). Dr. Berg also recommended that Plaintiff work no more than four hours a day at a sit-down job with no field work. (*Id.*).

Plaintiff met with Dr. Berg again on September 13, 1999. (Tr. 147). Plaintiff's kneecap was tracking well, with no effusion or warmth. (*Id.*). There was some fluid present in the knee and some bone bruising, but Dr. Berg reported that Plaintiff was doing an excellent job with

---

[5]Several medical records were provided by Plaintiff for office visits with Dr. Berg through 1999 to 2001, and some of Dr. Berg's summary letters overlap with the provided records. As such, only the highlights will be summarized due to the amount of material covered. (*See* Tr. 130-52).

physical therapy on his own, and noted he appeared stronger. (*Id.*). Dr. Berg recommended work duty with no lifting over fifty pounds, minimal stairs, minimal ladders, and no kneeling. (*Id.*).

Plaintiff was seen by Dr. Berg on October 11, 1999, and reported a very painful knee. (Tr. 146). Dr. Berg opined that Plaintiff's kidneys and stomach were being affected by taking Naprelan, so Dr. Berg switched Plaintiff to Vioxx for decreasing pain and inflammation. (*Id.*). Plaintiff tried Celestone injections, but the effects only lasted a couple weeks, so Dr. Berg recommended trying Hyalgan injections. (*Id.*). Plaintiff received his first series of Hyalgan injections November 15, 1999, through January 17, 2000. (Tr. 143-45). Plaintiff tolerated the injection well. (*Id.*). Plaintiff's last injection was a trigger point injection due to effusion of his knee and a significant point of tenderness right at the edge of the condyle. (Tr. 142). Dr. Berg opined that Plaintiff should avoid kneeling, ladders, and lifting from the floor over thirty-five pounds. (*Id.*).

Dr. Berg stated at his February, 2000, visit with Plaintiff that Plaintiff had reached his maximum level of medical improvement from his surgery, and that to get any more improvement, he would need a total knee arthroplasty. (Tr. 141). In March, Dr. Berg expressed his belief that Plaintiff could stand on concrete for eight hours as a mechanic if Plaintiff could work at waist level. (*Id.*). Dr. Berg cautioned that bending and lifting would put stress on Plaintiff's kneecap and cause problems. (*Id.*).

Dr. Berg spoke with Dr. Granieri, medical director for ComEd, on March 10, 2000. (Tr. 140). Dr. Berg recommended that Plaintiff return to work with the above restrictions, and he suggested a padded floor work station. (*Id.*). Plaintiff returned to work, but visited Dr. Berg three days later requesting a re-evaluation due to increased knee symptoms. (*Id.*). X-rays of

Plaintiff's left knee showed zero degrees of varus, medical compartment narrowing, and significant changes since Plaintiff's last X-ray. (*Id.*). Dr. Berg withdrew his recommendation that Plaintiff return to his job, and suggested a part-time sit down job. (Tr. 139). He also asked Plaintiff to consider a valgus osteotomy. (*Id.*). On March 31, 2000, Dr. Berg recommended that Plaintiff (who remained at ComEd) try to get a schedule that allowed four hours of sit down work with one hour of standing, which could progress to four hours sitting/four hours standing at a later time. (Tr. 138).

On April 10, 2000,[6] Plaintiff reported that his knee was flaring up from getting up at his desk, so he did not think he could work. (Tr. 137). Dr. Berg switched Plaintiff back to Naprelan from Vioxx, which Plaintiff could not tolerate. (*Id.*). In May, 2000, Plaintiff underwent a Maquet X-ray which showed he was in two degrees of varus deformity with early osteophytes of the medial joint with questionable early osteochondritis dissecans. (Tr. 135). Dr. Berg withdrew his recommendation for a valgus ossectomy due to the possible osteochondritis dissecans, and recommended an Array brace. (*Id.*).

On October 22, 2000, Plaintiff reported that his brace was causing him to have boils on his legs, so Dr. Berg adjusted the brace. (Tr. 133). Plaintiff's varus deformity increased, and Dr. Berg stated the Plaintiff's patellar crepitus was significant with irritation along the medial joint. (*Id.*). Dr. Berg opined that Plaintiff was starting to stretch out his anterior cruciate ligament. (*Id.*). Dr. Berg recommended another series of Hyalgan injections, which Plaintiff began on February 5, 2001. (Tr. 133, 132). Plaintiff also tried a new DonJoy brace. (Tr. 132). On April 9, 2001, Dr. Berg noted that the Hyalgan benefitted Plaintiff by removing the constant irritation,

---

[6]Plaintiff's last day of work was April 4, 2000.

but observed that Plaintiff still had trouble with a little clicking in his knee, swelling if Plaintiff did much walking, and trouble with weather changes. (Tr. 130).

On January 4, 2001, Dr. Berg responded to a request by the Bureau of Disability Determination Services to provide his opinion about Plaintiff's impairments and ability to do work. (Tr. 157-58). Dr. Berg stated the following:

> [Plaintiff] has varus deformity of his left knee with increasing traumatic arthritis plus significant traumatic arthritis of his patella. He is also developing this on his right knee. His left knee is deteriorated where he has gone through two series of Hyalgan injections and someday he will come to a total knee arthroplasty. Heavy work squatting and lifting are a problem so he would need a sit down type of job because of his knee.

(Tr. 158).

On September 10, 2001, Plaintiff saw Dr. Berg with a specific pain right at the muscle tendon junction of the gastroc-soleus complex. (Tr. 159). No swelling was present upon examination, but Dr. Berg recommended twelve treatments of phonophoresis (application of medicines with ultrasound) to the strained area. Plaintiff noted that his Hyalgan injections were wearing off and asked for another series. (*Id.*). The last series was administered seven months previously. (*Id.*). Plaintiff began his next Hyalgan series of three injections on November 12, 2001. (Tr. 160).

Dr. Ramchandani, a state agency physician, completed a consultive examination for Plaintiff at the request of the state agency on September 25, 2001. (Tr. 161). Plaintiff stated he had right knee pain since 1985, left knee pain since 1987, and back pain since 1987. (*Id.*). Dr. Ramchandani noted that Plaintiff had undergone three right knee surgeries and five left knee surgeries. (*Id.*). The doctor's physical examination revealed that Plaintiff was able to walk heel to toe, able to squat partially and stand from a squatting position with support, able to pick up

13

objects, make a fist, and flip pages. (Tr. 162). Dr. Ramchandani's impression was posttraumatic arthritis of knee joints, lumbar arthralgia, and varicose veins. (*Id.*). Lumbar X-rays ordered by Dr. Ramchandani revealed disk space narrowing and osteophyte formation at L3-4 and to a lesser extent, L4-5. (Tr. 165). Right knee X-rays were normal. (Tr. 167).

Dr. William Conroy, a state agency physician, completed a Residual Functional Capacity Assessment ("RFC") on October 19, 2001. (Tr. 175). Dr. Conroy reported that Plaintiff could occasionally lift/push/pull twenty pounds, frequently lift ten pounds, and stand/walk/sit for a total of six hours each in an eight hour workday with normal breaks. (Tr. 170). Dr. Conroy noted postural limitations for Plaintiff, stating that Plaintiff should never use ladders, ropes or scaffolds, but could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (*Id.*). No manipulative, visual, or communicative limitations were recorded for Plaintiff, but Plaintiff was restricted from concentrated exposure to machinery and height hazards, extreme cold, humidity, and wetness. (Tr. 171-72). Dr. Conroy opined that Plaintiff retained the ability to perform light work activity. (Tr. 175).

In January, 2002, Plaintiff was doing well until he lifted up his 100 pound dog, which caused his knee to start popping. (Tr. 184). Dr. Berg noted that a large plica was popping and the Plaintiff's VMO was very weak also. (*Id.*). He prescribed injections, cho-pat, and physical therapy. (*Id.*). In May and June, 2002, Plaintiff continued with Hyalgan injections under the supervision of Dr. Berg. (Tr. 183). Dr. Berg noted that Plaintiff may need another series of Hyalgan in six months. (*Id.*).

Plaintiff's left knee was getting more symptomatic in November, 2002, five months after his Hyalgan injections were finished. (Tr. 191). Plaintiff also noted pain in his right wrist. (*Id.*). Further examination by Dr. Berg revealed a positive Phalen's test at eight seconds with median

nerve numbness and positive Tinels over the medial nerve. (*Id.*). Plaintiff also had a palpable

cyst over his radial artery. (*Id.*). Dr. Berg suggested an EMG. (*Id.*).

On March 12, 2003, Plaintiff was seen by Dr. Berg regarding his tardy ulnar nerve palsy

and carpal tunnel syndrome, which was confirmed in an EMG. (Tr. 190). Dr. Berg stated that

Plaintiff had a growing volar wrist ganglion over his radial area. (*Id.*). Dr. Berg further noted

the complications of having carpal tunnel problems while being on crutches, so both knee and

wrist surgeries were delayed to determine the best surgical plan. (*Id.*).

On August 22, 2003, Plaintiff submitted to the Social Security Appeals Council a note

from Dr. Berg that stated that Plaintiff's medical restrictions as of August 14, 2003, were a "sit

down job. Elevate both legs every 15 minutes for 5 minutes." (Tr. 193-94).

## IV.    **STANDARD OF REVIEW**

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the

proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the

court, however, is not *de novo*; the court "may not decide the facts anew, reweigh the evidence

or substitute its own judgment for that of the [ALJ]." *Binion v. Charter*, 108 F.3d 780, 782 (7th

Cir. 1997); *see also Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999). The duties to weigh

the evidence, resolve material conflicts, make independent findings of fact, and decide the case

accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable

minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision

falls on the Commissioner." *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001). If the

Commissioner's decision is supported by substantial evidence, it is conclusive and this court

must affirm unless there is an error of law. 42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297

F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion*, 108 F.3d at 782.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Clifford v. Apfel*, 227 F.3d 863, 874 (7th Cir. 2000); *Rohan v. Charter*, 98 F.3d 966, 971 (7th Cir. 1996). Where a witness credibility determination is based upon the ALJ's subjective observation of the witness, the determination may only be disturbed if it is "patently wrong" or if it finds no support in the record. *Pope v. Shalata*, 988 F.2d 473, 487 (7th Cir. 1993); *Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989). "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have greater freedom to review the ALJ decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994); *Yousif v. Chater*, 901 F. Supp. 1377, 1384 (N.D. Ill. 1995).

## V.    FRAMEWORK FOR DECISION

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and accordingly denied his application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382(c)(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and

16

laboratory diagnostic techniques." 42 U.S.C. § 1382(c)(3)(C); *see also Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[7] The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the national economy.

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a)(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he or she is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[8] A severe impairment is one which significantly limits the claimant's physical or

---

[7]The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. *See* 20 C.F.R. Ch. III, Parts 404, 416. For syntactic simplicity, future references to Part 416 of the regulations will be omitted where they are identical to Part 404.

[8]The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments. *See, e.g.*, 20 C.F.R. § 404.1520(c). For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers from severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1. The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the inquiry moves on to Step Four.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his or her impairment. 20 C.F.R. § 404.1545(a). Although medical opinions bear strongly upon the determination of residual functional capacity, they are not conclusive; the determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1465; Social Security

Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant work, then he is found not disabled; if he is not so able, the inquiry proceeds to Step Five.

At Step Five, the Commissioner must establish that the claimant's residual functional capacity allows the claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon vocational expert testimony, or by showing that a claimant's residual functional capacity, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ correctly relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala,* 22 F.3d 687, 691-92 (7th Cir. 1994). If the Commissioner establishes that sufficient work exists in the national economy that the claimant is qualified and able to perform, then the claimant will be found not disabled; if not, the claimant will be found to be disabled.

## VI.    ANALYSIS

The court will proceed through the five step analysis in order.

### A.    Step One: Is the claimant currently engaged in substantial gainful activity?

The ALJ found no evidence that Plaintiff had engaged in disqualifying substantial gainful activity at any time since Plaintiff's alleged onset date. (Tr. 13). Neither party disputes this first determination, and there is substantial evidence to support the ALJ's finding. Thus, it is the Magistrate Judge's Report and Recommendation that the ALJ's determination as to Step One of the Analysis be affirmed.

### B.    Step Two: Does the claimant suffer from a severe impairment?

In performing the Step Two Analysis, the ALJ found that Plaintiff suffered from severe impairments. (Tr. 13). Specifically, the ALJ found that Plaintiff suffered from left knee arthritis, right knee chondromalacia, and bilateral carpal tunnel syndrome. (*Id.*).

Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from severe impairments. Thus, it is the Magistrate Judge's Report and Recommendation that the ALJ's determination as to Step Two of the Analysis be affirmed.

## C.    Step Three:  Does claimant's impairment meet or medically equal an impairment in the Commissioner's listing of impairments?

In performing the analysis for Step Three, the ALJ determined that Plaintiff's impairments do not meet or equal any impairment in the Listing of Impairments, 20 C.F.R. § 404.1520(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 13). The ALJ found that Plaintiff's impairments are "not severe enough to meet or medically equal one of the impairments listed in Appendix 1." (*Id.*). Specifically, the ALJ found that Listing 1.02 was not met, noting that the evidence of severity of Plaintiff's right knee impairment was questionable and that Plaintiff's testimony about mowing his lawn supported an ability to stand and walk longer than Plaintiff said he could. Lastly, the ALJ noted that Plaintiff's carpal tunnel problems could not meet a listing because the impairment was not alleged until 2003 and was set to be surgically corrected, so it will not likely satisfy the durational requirement of twelve continuous months. (Tr. 15).

The court agrees Plaintiff's symptoms do not appear to rise to the level of Listing 1.02 or any of the Musculoskeletal impairments in the Listings because Plaintiff can ambulate effectively. (Tr. 161-62, 175). The ALJ is also correct that Plaintiff's carpal tunnel impairment does not meet the durational requirements for a disability determination. Additionally, neither

party challenges the ALJ finding under Step Three. Therefore, substantial evidence exists to support the ALJ's Step Three finding, and this court finds no reason to disturb it. It is the Magistrate Judge's Report and Recommendation that the ALJ's determination as to Step Three of the Analysis be affirmed.

**D.      Step Four:  Is the claimant capable of performing work which the claimant performed in the past?**

In performing the analysis under Step Four, the ALJ determined that Plaintiff no longer has the residual functional capacity to perform his past relevant work as a maintenance mechanic. (Tr. 16). Before doing so, the ALJ determined Plaintiff's RFC. (*Id.*). The RFC is what a claimant can still do despite his or her limitations. *See* 20 C.F.R. §416.945. After considering the entire record, the ALJ stated that Plaintiff had the residual functional capacity for the full range of sedentary work.[9]

In support of the RFC statement, the ALJ expressed that Plaintiff's pain was not severe enough to further reduce his RFC. (Tr. 16). Specifically, the ALJ noted that Plaintiff's allegations regarding his limitations were not totally credible because Plaintiff's right knee impairment was treated long before the alleged on-set date and the claimant worked at a light duty job for years with it. (*Id.*). In addition, the ALJ stated that Plaintiffs Hyalgan injections provided him several months of relief, and the Darvocet dropped his pain from a "seven" to a

---

[9]"Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §404.1567. "'Occasionally' means occurring from very little up to one- third of the time, and would generally total no more than about 2 hours of an 8-hour workday. Sitting would generally total about 6 hours of an 8-hour workday." SSR 96-9p.

"five." (*Id.*). Likewise, the ALJ pointed out that although Plaintiff stated he took two or three Darvocet pills a day, his pill supply records indicated that he was only taking one pill every four days. (*Id.*). Further, the ALJ noted that Plaintiff's most recent X-ray of his right knee was normal. (*Id.*). The ALJ also noted that Plaintiff's testimony about mowing a lawn supports an ability to stand and walk longer and over a greater distance than asserted. (*Id.*). Finally, the ALJ questioned Plaintiff's testimony that Dr. Ramchandani first discovered Plaintiff's carpal tunnel problems because the ALJ found nothing indicating this in Dr. Ramchandani's report. (*Id.*).

The ALJ's RFC determination is challenged by Plaintiff. At issue is whether there is substantial evidence in the record to support the ALJ's finding that Plaintiff can perform the full range of sedentary work. Plaintiff specifically argues that the ALJ's RFC is unsupported because the ALJ failed to give controlling weight to Dr. Berg's opinion and because he based the RFC on a wrongful credibility determination. Defendant asserts that the ALJ's RFC is substantiated by Plaintiff's medical record and should be upheld.

The court's own review of the record as a whole revealed no errors of law, and the court agrees that the ALJ's ruling is supported by substantial evidence. Not one of Plaintiff's physicians issued an opinion of disability. Instead, they each opined that Plaintiff could do a "sit down type of job," (Dr. Berg, Tr. 158), or "light work," (Dr. Conroy, Tr. 175). Plaintiff's pain is managed by his Nyalgan injections, Darvocet, and non-prescription treatments like icing and Aleve and Aspirin. His knees are protected by custom braces. Plaintiff did not testify that his pain interferes with his concentration or ability to do small tasks. Plaintiff retains the ability to do small chores. Plaintiff's right knee X-ray was normal. (Tr. 167). This, and all of the evidence noted by the ALJ, leads this court to its position that the ALJ's finding that Plaintiff can

22

perform a full range of sedentary work is reasonable and supported by the record. Further, Plaintiff's points of contention, which fall into two main categories addressed below, do not trigger a reversal or remand of the ALJ's decision.

## A. Plaintiff's Treating Physician's Opinion Is Not Inconsistent With The ALJ's RFC

Dr. Berg obviously has a long history of treating Plaintiff. Medical records submitted to the court date back to November, 1987, when Plaintiff's knee injury at work precipitated his current problems with his right leg. Dr. Berg's prognosis for Plaintiff has changed over time, often depending on Plaintiff's physical therapy and reaction to his knee injections. For example, In February, 2000, Dr. Berg opined that Plaintiff could work standing for eight hours a day if he could work at waist level. (Tr. 141). Then, in March, 2000, Dr . Berg recommended that Plaintiff work four hours at a sit-down job, and one hour of standing -- working up to four hours of standing. (Tr. 138). Dr. Berg also recognized that Plaintiff responded positively to his Hyalgan injections, leaving only trouble with a little clicking in the knee, swelling, and intolerance of weather changes. (Tr. 130). In fact, the doctor's official opinion to the Bureau of Disability stated that Plaintiff would need a sit down job to work because of his knee. (Tr. 158). It was not until after Plaintiff's hearing before the ALJ that Plaintiff submitted a short note dated August 14, 2003, from Dr. Berg that stated Plaintiff would need a "sit down job. Elevate both legs every 15 minutes for 5 minutes." (Tr. 193-94).

The one page record from Dr. Berg, not submitted to the ALJ, is not considered for purposes of substantial evidence review. *See Eads v. Sec'y of Health and Human Servs.*, 983 F.2d 815, 817-18 (7th Cir. 1993). The document could entitle Plaintiff to a sentence six remand (42 U.S.C. §405(g)) if Plaintiff demonstrated that "there is new evidence which is material and

that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." (*Id.*). For the evidence to be considered material, there must be a "reasonable probability that the [ALJ] would have reached a different conclusion had the evidence been considered." (*Id.*).

Plaintiff has not shown that the note from Dr. Berg had a reasonable probability of influencing the ALJ's decision. The ALJ found Plaintiff could do a full range of sedentary work. Most of Dr. Berg's statements, including his opinion to DDS, recommended sedentary work. Only the one statement by Dr. Berg dated one month after Plaintiff's hearing possibly reflects documented restrictions on Plaintiff's ability to do sedentary work. Plaintiff suggests that is "a simple matter of arithmetic" to determine that Plaintiff cannot do sedentary work based on the note because there would be no way for Plaintiff to walk two hours in an eight hour day, as required for sedentary work, "[i]f [Plaintiff] was raising both legs every 15 minutes for five minutes, in an 8 hour day." (Pl.'s Reply, at III). Plaintiff's proposition makes no sense. Were Plaintiff to follow the directions of Dr. Berg, he would need to prop his legs up for as much as two hours and forty minutes a day total. That leaves Plaintiff five hours and twenty minutes to complete his two hours of walking that is a requirement for finding that Plaintiff is capable of performing sedentary work. It appears to the court that Dr. Berg's medical opinions as a whole support the RFC of the ALJ. Thus, it is the position of the Magistrate Judge that Plaintiff is not entitled to a remand under §405(g) for reconsideration in light of Dr. Berg's note, nor is the Plaintiff entitled to reversal or remand because the ALJ's RFC is inconsistent with the medical record.

**B.    The ALJ's Credibility Determination Was Reasonable**

Generally, a court will only reverse an ALJ's credibility determination if it is "patently wrong." *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003). In evaluating credibility, the ALJ must follow her own regulations, including SSR 96-7p, which lists relevant considerations for evaluating credibility. *Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003). "The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision." SSR 96-7p. Thus, an ALJ's conclusion is afforded great deference so long as the court finds that the ALJ followed proper procedures in making his or her determination. Even so, administrative law opinions are subject to harmless error review, such that every technical violation of the SSR does not equate to an automatic reversal or remand. *See Keys v. Barnhart*, 347 F.3d 990 (7th Cir. 2003).

Even though rational minds may disagree as to the outcomes flowing from testimony presented, the court will uphold the ALJ's decision if substantial evidence underpinning it exists. *See Farrell v. Sullivan*, 878 F.2d 985, 990 (7th Cir. 1989). In this case, the ALJ found Plaintiff's allegations regarding his limitations "not totally credible" because: (1) Plaintiff admitted mowing his lawn in fifteen minute intervals, which requires extensive walking, standing, and pushing; (2) Plaintiff received several months of relief from Hyalgan injections; (3) Plaintiff stated he took Darvocet two or three times a day, but the medication list prepared by Dr. Berg showed that he averaged one pill every four days; and (4) Plaintiff admitted success with over the counter analgesics for pain relief. (Tr. 15-16). The ALJ also questioned the severity of Plaintiff's right knee impairment, noting that Plaintiff worked for years at light job duty with the impairment and that Plaintiff's recent X-ray showed a normal right knee. (Tr. 15).

As required by SSR 96-7p, the ALJ's credibility assessment takes into account Plaintiff's entire case record, including the objective medical evidence, the Plaintiff's own statements about his symptoms, information provided by treating and examining physicians, and other relevant evidence including the Plaintiff's daily activities and the type, dosage, and effectiveness of medication the Plaintiff takes. Further, the ALJ's statements are sufficiently specific to allow subsequent reviewers to follow the ALJ's reasoning. It is abundantly clear that the ALJ found Plaintiff's subjective complaints exaggerated compared to his longitudinal medical record. By pointing out each of the above discrepancies with Plaintiff's subjective complaints and the objective evidence, none of which is disputed or explained by Plaintiff, the ALJ built up solid support in the record for his decision. Thus, the court finds that the ALJ's credibility determination was grounded in the record and adequately justified in the opinion. As such, the court finds no reason to recommend reversing or remanding the ALJ's finding for a new credibility determination.

Finding the ALJ's RFC supported by substantial evidence in the record and finding Plaintiff's arguments against the ALJ's Step Four analysis unpersuasive, it is the Magistrate Judge's Report and Recommendation that the ALJ's determination as to Step Four of the Analysis be affirmed.

**E.      Step Five: Is the claimant capable of performing any work existing in substantial numbers in the national economy?**

At Step Five, the ALJ relied on the Medical-Vocational Guidelines ("the Grids") to determine if Plaintiff could perform substantial gainful work which exists in the national economy. (20 C.F.R. Pt. 404, Subpt. P, App. 2, Table No. 2, Rule 201.28). Based on Plaintiff's

RFC of a full range of sedentary work and Plaintiff's status as a younger individual with a high school education (*see* 20 C.F.R. 404.1563), the ALJ found that the Grids directed a finding of "not disabled." (Tr. 16).

Other than disputing the ALJ's finding that Plaintiff could complete a full range of sedentary work, Plaintiff does not dispute the ALJ's analysis at Step Five. Likewise, Defendant asserts that the ALJ properly applied the Grids in making his determination that Plaintiff was not disabled. The ALJ's RFC has already been reviewed and approved of in this court's Step Four Analysis. Substantial evidence exists in the record supporting the ALJ's decision. Therefore, it is the Magistrate Judge's Report and Recommendation that the ALJ's determination as to Step Five of the Analysis be affirmed.

**VII.  CONCLUSION**

In accordance with the above, it is the Magistrate Judge's Report and Recommendation that the ALJ's decision to deny benefits to Plaintiff be sustained, affirming the ALJ at all steps of the disability determination process as outlined above. It is the Magistrate Judge's further Recommendation that Defendant's Motion for Summary Judgment be granted, and Plaintiff's Motion for Summary Judgment on the administrative record and pleadings be denied.

ENTER:

P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

DATE: 12/15/04

27